[Crim. No. 2347. In Bank.—May 5, 1921.]

In the Matter of the Accusation of the BAR ASSOCIATION OF SAN FRANCISCO, Plaintiff, v. JOHN J. SULLIVAN, Defendant.

[1] ATTORNEY AT LAW—DISBARMENT—EVIDENCE.—In a proceeding for the disbarment of an attorney for conduct involving moral turpitude, while it may be conceded that it may not be' necessary, as in strictly criminal prosecutions, that guilt be established beyond all reasonable doubt, a finding of guilt should be made only upon such proof as clearly and satisfactorily establishes guilt in the minds of the judges.

[2] ID.—INFERENCES—PRESUMPTION OF INNOCENCE.—In such a proceeding all intendments should be in favor of innocence, and where two or more equally reasonable inferences may be drawn from a fact shown, that inference leading to a conclusion of innocence should be accepted rather than one leading to a conclusion of guilt; especially is this true where the charge is of acts constituting a felony involving the grossest of moral turpitude, and a conviction of which in a strictly criminal prosecution not only subjects the offender to imprisonment in the state prison, but also forever disqualifies him from holding any office in this state.

---

1. Moral delinquency or other conduct not affecting court or client as ground for disbarment of attorney, notes, 42 Am. Rep. 557; 9 A. L. R. 189.

Disbarment or suspension of attorney for misconduct in an official capacity other than his attorneyship itself, note, L. R. A. 1915A, 663.

Disbarment of attorney for criminal act in advance of conviction, notes, 114 Am. St. Rep. 839; 8 Ann. Cas. 847.

Acquittal of criminal charge as defense to disbarment proceeding for same offense, note, 10 Ann. Cas. 887.

2. Presumption of innocence in disbarment proceedings, note, 7 A. L. R. 93.

[3] Id.—Insufficiency of Evidence.—In this proceeding for the disbarment of an attorney on charges of agreeing to receive and receiving money upon the corrupt understanding and agreement that his official conduct as a police judge should be thereby influenced, it is held that none of the specific charges were sustained by the evidence sufficient to satisfy the court of its truth.

PROCEEDINGS for disbarment of defendant as attorney and counselor at law for conduct involving moral turpitude. Dismissed.

The facts are stated in the opinion of the court.

Max J. Kuhl, M. C. Sloss, John O'Gara and Joseph J. Webb for Plaintiff.

Walter H. Linforth, Bert Schlesinger and Lewis F. Byington for Defendant.

ANGELLOTTI, C. J.—This is a proceeding instituted in this court for the disbarment of John J. Sullivan, an attorney and counselor, for conduct involving moral turpitude. Defendant was at all the times mentioned in the accusation one of the police judges of the city and county of San Francisco, and all the charges against him are for acts and conduct on his part with relation to matters coming before him as such police judge, our law providing that an attorney and counselor may be removed "for the commission of any act involving moral turpitude, dishonesty or corruption, whether the same be committed in the course of his relations as an attorney or counselor at law, or otherwise." (Code Civ. Proc., subd. 5, sec. 287.) Three separate, specific charges against the accused are made by the accusation. Each charge involves the most serious accusation that can be made against a judicial officer, viz., that of agreeing to receive and receiving money upon the corrupt understanding and agreement that his official conduct shall be thereby influenced. All of the charges were denied by the accused by verified answer filed herein. This court retained jurisdiction of the matter instead of transferring it to a district court of appeal, because of the seriousness of the charges and the official station of the accused. By order of the court, the evidence in support of and against the charges was taken by the chief justice, and the transcript of the evi-

dence so taken has received the careful consideration of each member of the court.

No serious question of law is presented. It is conceded, of course, that by this accusation the accused was called upon to meet only the specific charges made against him therein, and that we are confined to those specific charges, viz., agreeing to receive and receiving money upon the corrupt understanding alleged, in the matters and proceedings specified in the accusation. No other misconduct is alleged in the accusation or included in the charges filed. On the other hand, it is clear that if it is satisfactorily shown that with regard to any of the proceedings specified in the accusation the accused either agreed to receive or received any money upon any such corrupt understanding as is alleged, the accusation should be held to be sustained and the accused disbarred. Some question is raised as to the degree of proof essential to warrant a conviction, i. e., whether the rule applicable in criminal prosecutions that guilt must be shown beyond all reasonable doubt obtains in such a proceeding as this. So far as appears, this precise question has never been determined by this court. A disbarment proceeding is not a prosecution for crime. In some states, however, it has been held that the charges must be proved beyond a reasonable doubt to warrant disbarment. In discussing a question of the sufficiency of an accusation this court has said: "This accusation is in the nature of a criminal .charge, and all intendments are in favor of the accused. The accusation is not sufficient if, all its statements being true, the accused could be innocent. (*Matter of Haymond,* 121 Cal. 385, 388, [53 Pac. 899, 900].) And again: "A judgment against the respondent will deprive him of personal and property rights. Unless we are clearly satisfied of respondent's guilt we ought not to remove or suspend him from the practice of his profession. As we are not so satisfied, we decline to strike his name from the roll." (*Disbarment of Houghton,* 67 Cal. 511, 517, [8 Pac. 52].) This, of course, means that something more than the mere preponderance of proof that will suffice in the ordinary civil cause is essential. [1] While we may concede that it may not be necessary, as in strictly criminal prosecutions, that guilt be established beyond all reasonable doubt, we are satisfied that a finding of guilt should be

made only upon such proof as clearly and satisfactorily establishes guilt in the minds of the judges. [2] It seems, furthermore, clear that in such a proceeding all intendments should be in favor of innocence, and that where two or more equally reasonable inferences may be drawn from a fact shown, that inference leading to a conclusion of innocence should be accepted rather than one leading to a conclusion of guilt. (*In re Application of Alameda County Bar Assn.*, 35 Cal. App. 534, 536, [170 Pac. 432].) Especially does this seem true where the charge is of acts constituting a felony involving the grossest of moral turpitude, and a conviction of which in a strictly criminal prosecution not only subjects the offender to imprisonment in the state prison, but also forever disqualifies him from holding any office in this state. (Pen. Code, sec. 98.)

The specific charges contained in the accusation are as follows:

First: That in two felony matters pending before him as a committing magistrate, each against one Bernardino Catterini, charged with assault with a deadly weapon with intent to commit murder, the accused, on or about January 12, 1918, did agree to receive and did receive $150 in money, "as a bribe, from one Peter P. McDonough, upon the corrupt understanding and agreement" between him and said McDonough that he, as such police judge, should thereby be corruptly and unlawfully influenced in his decision of said two cases, and that he was thereby corruptly and unlawfully influenced and dismissed said cases corruptly and unlawfully. This matter will hereinafter be referred to as the Catterini matter.

Second: That on or about September 23, 1918, while one Tony Spinelli was in custody on a charge of assault with intent to commit murder, the accused agreed to receive, and did receive, fifty dollars in money from one C. Vincent Riccardi upon the corrupt understanding and agreement between himself and Riccardi that his action and decision in the matter of the approval of a certain bail bond for five thousand dollars signed by Angelo Cosenza and Malina Cosenza then presented should thereby be corruptly influenced, and that he should in return for said money approve said bond and order the release of Spinelli from custody; and that he was thereby corruptly influenced to do

so, and did approve said bond and make said order for release. This matter will be hereafter referred to as the Spinelli matter.

Third: That in a misdemeanor prosecution against one Pastiango, who was charged with violating the provisions of an ordinance prohibiting lewd and lascivious acts, the accused, on or about November 28, 1919, agreed to receive, and did receive, forty dollars money as a bribe from said Riccardi, upon the corrupt and unlawful agreement between them that in return for said money he would discharge said Pastiango from custody upon his own recognizance immediately after finding him guilty and sentencing him to ninety days' imprisonment in the county jail, all of which he did. This matter will be hereinafter referred to as the Pastiango matter.

At the outset it should be stated that as to all the charges the only direct evidence of guilt of the accused is that of one C. Vincent Riccardi, who was at all the times referred to in this proceeding a duly admitted attorney and counselor at law. Probably no witness has ever appeared before a judicial tribunal who was shown to be less worthy of credit in the absence of substantial corroboration than this witness. According to his own testimony, he was for many months a voluntary and active participant, for his own private and personal financial gain, in a system of disposing of matters in the police courts of San Francisco by the bribery of judges thereof, and he was the instigator and prime mover in the particular corruption charged against the accused in this proceeding. That his reputation for truth, honesty, and integrity in the community in which he lived is bad is established by many reputable witnesses, and not denied. Moreover, a motive for the giving by him of sensational evidence relating to conditions in the police courts is most clearly apparent. Early in the year 1920 he was convicted of felony embezzlement in the superior court of San Francisco, and on such conviction adjudged to suffer imprisonment in the state prison. His activities in the matter of disclosures relative to police court conditions immediately followed such conviction. His imprisonment on such conviction was postponed by an appeal, and he has been at large on bail. At the time he testified before this court the judgment had not become final. It had been

affirmed by the district court of appeal, but the matter was still pending on application for hearing in this court. In all his activities in the matter of disclosures he has known that in the event of the affirmance of the judgment against him his only chance of escape from imprisonment was the granting of executive clemency. His own testimony on this matter showed very clearly that he fully realized that by giving the character of sensational evidence relative to corruption in the police courts that he was giving before the grand jury, the Bar Association committee, and in this proceeding he might create the feeling that he was rendering so great and impressive a public service as to make a pardon in his own matter a proper recognition and reward. That he had such a hope he freely admitted, as well as that, by reason of his disclosures, he had already received some assurances of friendly interest. Of course, these were given him in view of a belief on the part of those giving them that he was telling only the truth. But it is obvious that he fully realized that no movement for executive clemency in his own behalf could be inspired by a story on his part that was devoid of sensational exposure of official corruption. Hence, we find here the strongest kind of a motive for false accusation against the police judges. We think it is self-evident that no statement of this witness can be accepted as true simply because he testifies to its truth. It may or may not be true, but uncorroborated it cannot produce conviction in an unprejudiced mind.

With these observations we proceed to discuss the evidence relative to the various charges, taking up first the Pastiango matter.

Pastiango was first charged with a felony in having violated section 288 of the Penal Code. The matter was pending before accused as a committing magistrate, and Riccardi was acting as his attorney. The matter was heard on November 13, 1919, Mr. Maundrell, assistant district attorney, appearing for the people and Riccardi for the defendant. But one witness was presented by the prosecution, the girl upon whose body the alleged acts were charged to have been committed. According to her testimony, she was three months and two days short of being fourteen years of age at the time of the commission of the alleged crime. Her testimony being concluded, further hearing was continued

until November 17, 1919. On that day, when the matter came on for further hearing, Mr. Maundrell said: "From the testimony of the complaining witness in this case the prosecution fails as far as section 288 of the Penal Code is concerned. And at this time I will recommend that the defendant be arrested under Ordinance 1059," an ordinance prohibiting any lewd, indecent, or obscene act or conduct, and making a violation of its terms a misdemeanor. The accused then announced that the felony charge would be dismissed, and continued the matter for dismissal to the next day, presumably to give time for the institution of the misdemeanor prosecution. On the next day the dismissal was made by the accused. A prosecution under the ordinance was instituted, and it was in relation to the disposition of this prosecution that the bribe was alleged to have been agreed to be given and accepted. The only direct evidence as to this is that of Riccardi. He is rather vague and indefinite as to the time when the agreement was made, except that he said several times it was before "the dismissal," by which he must mean the dismissal of the felony charge, for this was the only "dismissal" in that matter. In fact, Riccardi testified on direct examination here that the agreement between him and the accused included the dismissal of the felony charge, but subsequent testimony on cross-examination would indicate that his alleged talk with the accused about the matter was during the pendency of the misdemeanor prosecution. This dismissal, we have seen, was recommended by the prosecuting officer for failure of evidence to establish the crime alleged *under section 288 of the Penal Code.* Substantially the alleged agreement was that in return for forty dollars to be paid to the accused judge, Pastiango was to be given what was called "a suspended sentence," meaning that although he was to be found guilty and sentenced, execution of that sentence was to be suspended. The misdemeanor case was subsequently submitted to the accused judge upon evidence conceded to be the same as that given upon the felony charge, a transcript of which is in evidence here. The accused found the defendant guilty, sentenced him to ninety days' imprisonment in the county jail, and suspended execution of sentence. Riccardi says that while the case was pending he agreed to give the accused forty dollars in this matter in payment for such

action on his part, and that .on the day the matter was disposed of he gave him the money. The accused denies absolutely any arrangement whatever with Riccardi in the matter and denies that he was paid any money by Riccardi.

The only pretense of corroboration of Riccardi's evidence which is here claimed is the action of the accused in the Pastiango case in view of the evidence given therein, and his statements on cross-examination here as to his reasons for suspending execution of the judgment. Of course, it is not claimed that mistakes in acts and decisions of a judge that may reasonably be attributed simply to bad judgment or even gross carelessness in the discharge of official duty constitute evidence of *bribery* of the judge. And yet at best we have no more here in regard to the disposition of the Pastiango matters. The dismissal of the felony charge was asked by the prosecuting attorney, as to whom there is no insinuation of misconduct. There was room for an honest difference of opinion as to whether the special offense defined by section 288 of the Penal Code was sufficiently shown by the only evidence produced, presumably the only evidence obtainable, to warrant holding the defendant for trial thereon in the superior court, and the situation was such that not even a suspicion of corrupt influence arises from the mere act of the accused in acceding to the request of the prosecuting attorney.

As to the suspension of execution of the judgment in the misdemeanor matter, the law of this state authorizes such action, and we know that it is a course very frequently, perhaps too frequently, followed. Whether or not in any particular case the circumstances are such as to warrant such a disposition is peculiarly one for the trial judge. Personally, we should feel that if Pastiango was guilty of soliciting this girl by word or act to engage in lewd, indecent, or obscene conduct with him, the case was not one for suspension of execution of the judgment. But we cannot say from the evidence before us that the accused did not in good faith consider it a proper case for such action. Some of his reasons for his action in this case given in justification when being pressed by able counsel on cross-examination in this court certainly do not appeal to *us* as being good reasons. It is, however, only fair to the accused to say that among his reasons given for suspending

execution of the judgment was that in view of the testimony of the girl, and the manner of her testifying and the circumstances of the case generally, he was not satisfied of the guilt of the defendant, and further, that neither the prosecuting officer nor the arresting officer objected to the course followed. We cannot find in either his conduct in the case or in his testimony any corroboration of Riccardi's evidence with relation to a bribe. As we look at the matter, in so far as agreeing to accept or accepting a bribe is concerned, it is simply Riccardi's word against that of the accused, with the result that we are not satisfied of the guilt of accused of the offense charged.

As to the Spinelli matter: Spinelli had been arrested on a charge of assault with intent to commit murder. The matter had been assigned to Police Judge Brady's department, and application was made by Riccardi to the accused at his residence during the evening of September 23, 1918, to approve a five thousand dollar bond offered for the release of Spinelli. Riccardi testified that during the day he had arranged with accused to meet him at his home that evening, both to fix the bail at five thousand dollars and to approve the bond offered, and that he was to pay him fifty dollars for so doing. The accused testified that he had heard nothing about the case until Riccardi with others called at his house that evening and requested approval of the bond. He further testified that according to his recollection Judge Brady had fixed the bail at five thousand dollars. There is no evidence other than Riccardi's as to the fixing of the bail by accused, or as to any previous arrangement with accused for the approval of the bond. It is a common occurrence for police judges to approve bail bonds out of office hours at their homes. Riccardi, who had the bond prepared at his office, even to the signatures of the sureties, went with the sureties to the home of the accused and proffered the bond to the accused with a request for its approval. It was approved by accused, who affixed his signature either then or the next day to the jurat on the affidavit of each surety, and also to the certificate of acknowledgment and approval, signed an order for release, which he gave to Riccardi, and retained the bond. Riccardi testified that in pursuance of his agreement he then gave the accused fifty dollars, and the accused testified that there was no ar-

rangement for any payment and that no money was paid. As to this it is simply Riccardi's word against that of the accused. The only alleged corroboration of Riccardi's testimony is in the circumstances attendant on the approval of the bond. Riccardi testified that the accused did not examine or swear the sureties, and one of the sureties, Angelo Cosenza, whose knowledge of the English language was so defective that he was compelled to testify through an interpreter, testified that the accused said nothing to him and talked only to Riccardi. The accused testified that he must have sworn the sureties, as this was his universal custom. We are not prepared to hold that he did not purport to do this in the informal way that unfortunately is adopted very often by careless officials, so informal, in fact, in some cases as to fail to bring to the knowledge of the witness the fact that an oath is being administered. It is admitted by the accused, however, that he did not examine the sureties as to their sufficiency, confining his questioning to Riccardi and relying wholly upon Riccardi's assurances as to their sufficiency and qualification. He apparently believed that he was fully justified in so doing. In thus doing he was guilty, of course, of gross neglect of duty. Nor could he have carefully examined the bond, for a reading of the affidavits of the sureties, who were husband and wife, disclosed that the property described in the affidavit of each as "his property" that "stands of record in his name" and stated to be of the value of nine thousand dollars, was the same identical property, a lot in San Jose. Cosenza testified here that this property was worth only two thousand dollars, and an examination by the accused of the sureties would doubtless have disclosed that fact. But this is not a proceeding against accused based upon a charge of neglect of official duty. The question is whether, in view of Riccardi's testimony, it sufficiently warrants an inference of the alleged bribery. We are perfectly satisfied that it does not. It may much more reasonably be attributed to a careless method of transacting official business, in acting solely upon the assurance of another in lieu of the personal investigation that a proper conception of official duty and responsibility requires. To our minds it affords no evidence whatever of the specific charge of bribery, with the result that as

to the bribery charge we have nothing but Riccardi's word, and are not satisfied of the guilt of the accused thereof.

As to the Catterini matter: The charge here is that accused agreed to receive, and did receive, $150 from one Peter P. McDonough, upon the corrupt agreement between them (McDonough and accused) that his conduct in such matter should be influenced thereby. Riccardi was the attorney for Catterini. His dealings in the matter of the alleged corrupt arrangement were with McDonough alone, his testimony being to the effect that, there being one thousand five hundred dollars obtainable from Catterini, he arranged with McDonough that the latter should have the bail fixed at one thousand dollars cash, and the case subsequently dismissed, and that the one thousand five hundred dollars should be divided, five hundred dollars to McDonough, five hundred dollars to the accused, and five hundred dollars for himself. McDonough testified that there was no arrangement relative to the case between himself and Riccardi, except that in the course of his business as a bailbond broker he, at the request of Riccardi, and for the usual commission of ten per cent, furnished the bail money. He further testified that he never spoke to the accused about the case and never paid him any money on account thereof. The accused testified that McDonough never spoke to or communicated with him about the case and never paid him any money on account thereof. According to his own testimony, Riccardi's only talk with the accused about the matter was some time after the dismissal, when he asked him how much McDonough gave him in the Catterini matter and the accused, on being told by Riccardi that he was to receive five hundred dollars, said that McDonough gave him only $150. The accused denied that any such conversation occurred.

Catterini was arrested the evening of January 1, 1918, voluntarily surrendering himself into the custody of an officer on learning that he was being looked for, on two charges of assault with intent to commit murder, alleged to have been committed between 12 and 1 A. M. of the same day.

On January 2, 1918, bail was fixed by accused on the two charges at a total of two thousand dollars, or one thousand dollars cash, and the cash being deposited, Catterini was

released from custody at 11:55 A. M. According to Riccardi's uncorroborated word he had asked the accused to fix the bail and accused had declined to do so at the moment, in view, as he stated, of the seriousness of the charge, and Riccardi had then gone to McDonough and solicited his assistance, with the result that the bail was fixed. The order fixing bail was filled in, except for the amount, in the handwriting of the clerk of the court, a Mr. Hagan, who testified that he had never made out an order fixing bail unless the court was in session. The amount and signature of the judge are in red ink, and the accused testified that he knew the signing was done in court for the reason that all signatures while on the bench were made in red ink, and all while off the bench in black ink. He further testified that he fixed the bail at Riccardi's request. There is absolutely nothing to show any communication, direct or indirect, from McDonough to accused prior to the making of such order; except in so far as one may speculate in view of the intimate relations existing between accused and McDonough, and the amount of bail fixed. To hold that there was such communication would be to indulge in the purest of guesswork. Certainly we may not in a judicial proceeding fairly infer therefrom any arrangement between them *for a bribe*. It is as reasonable to infer in view of the circumstances we have stated that the bail was fixed in court solely at Riccardi's request, as testified to by the accused, as it is to infer that this action was had because of some possible communication from McDonough.

Riccardi's testimony as to the amount of money paid by Catterini is flatly contradicted by that of Catterini, who impressed the court as honestly endeavoring to tell the truth. He said that he paid $225 in cash and Liberty bonds, and eight hundred dollars on a note that he signed on January 12, 1918, being $1,025 in all. He also contradicted Riccardi as to ever having been taken to McDonough's place of business, testifying that he never saw McDonough until long after the dismissal of the charges against him. There is some corroboration of Riccardi's testimony as to having some sort of arrangement with McDonough to be found in the fact that the eight hundred dollar note signed by Catterini was payable to Mrs. Riccardi (the mother of Riccardi) and McDonough jointly, although McDonough testified that his

connection with the matter was solely for the purpose of accommodating Riccardi in obtaining cash for his fee, and that he received eighty dollars for his indorsement of the note and the giving of his name as security. This was in addition to the one hundred dollars which he received for furnishing the one thousand dollars cash bail on which Catterini was released. But whatever the arrangement between Riccardi and McDonough, no conclusion adverse to the accused can be based thereon in the absence of evidence connecting him with the matter.

Catterini having been released on bail, the hearing on the charges was continued from time to time, testimony being taken on several of the days on which the matter came on for hearing, until finally, in April, 1918, the charges were dismissed by the accused. At these various hearings the people were represented by an assistant district attorney, Mr. Maundrell. The case was fully heard, and nothing out of the ordinary course of procedure appears in the transcript of the proceedings. Some point is made of the fact that the accused, with the attorneys, went to the hospital to take the evidence of the woman who, it was alleged, was shot by Catterini. To our minds there is absolutely nothing, except the testimony of Riccardi, to indicate that this was done at the instance of McDonough, or otherwise than in regular course. When the taking of testimony was fully concluded, the matter was submitted to the accused for decision. The transcript of the proceedings is before us, and it shows that at that time the following occurred:

"Mr. Riccardi: We have not any further evidence, your Honor.

"Mr. Maundrell (Assistant District Attorney): The case of the people is in in this matter.

"The Court: How do you feel about it yourself, Mr. District Attorney?

"Mr. Maundrell: There is a question in my mind that there might be a probable cause for a holding. I will submit the matter to the court.

"The Court: There is a question in my mind, and it is reinforced by the fact that the defendant surrendered himself. That isn't ordinarily the act of a guilty man, nor is it indicative of a consciousness of guilt. The identification by the complaining witness, or the injured person, is entirely

unsatisfactory, and the identification of a neck-tie and pin and a pair of shoes. It seems that a person who was present committing an act of that character would have rendered some other mark of identification which could have been made more complete and satisfactory.

"Mr. Maundrell: I understand there is a ten thousand dollar damage suit upon file against the man three weeks ago.

"Mr. Riccardi: He has property. He will pay if he loses. That is what they wanted in the first place.

"The Court: Dismissed."

It appears from the foregoing that the assistant district attorney was doubtful as to the advisability of holding the defendant for trial in the superior court, and certainly did not urge or request a holding. It appears from his evidence given in this proceeding that he, as prosecuting officer, talked with the accused in his chambers that morning before the case was dismissed as to what should be done with it, and a fair reading of his evidence here indicates that it was his recollection that he then expressed to the accused his doubts as to the propriety of a holding for trial. The question in the cases was as to the identity of the man who in fact made the assaults, the defendant denying that he was that man. There was positive identification by the woman assaulted and her little daughter, the other person assaulted, but this was somewhat weakened by matters educed on cross-examination, and there were also one or two other circumstances pointing to defendant as the guilty party. On the other hand, there was an apparent absence of motive on the part of defendant, good evidence as to his reputation for honesty, integrity, industry, peace, and quiet, his absolute denial of the charge, and some evidence in support of his claim that he was elsewhere when the assault was committed. It also appeared that a civil action for damages on account of this assault had been instituted against him and was then pending. From the cold record of the evidence given on the preliminary examination it would seem to us that a committing magistrate might well have concluded that there was probable cause for holding defendant for trial before a jury. But the record of proceedings before accused is not such as to satisfy us that the accused did not in good faith think otherwise. It seems that the assistant district attorney who

conducted the case, and who consulted during the course of the proceeding with a private attorney interested in the prosecution who attended the proceedings, thought otherwise, and the police court transcript in the case is not such as to warrant the inference of improper influence upon the accused in the matter, and much less the conclusion that his action was due to an agreement for a bribe.

But one other alleged item of corroboration remains to be noticed. The evidence does disclose an unfortunate and deplorable intimacy between accused and McDonough, one certainly calculated to bring the accused and his court into disrepute. The two had been friends for many years, the friendship dating from a time long prior to the accession of the accused to the police bench. McDonough has been for many years engaged in the business of furnishing cash bail for persons charged with public offenses, especially in the police courts, and his volume of business in the police courts was very large. By reason of the character of his business he was necessarily much interested in the fixing of bail for defendants, and also likely to be interested on occasions in the final disposition of their cases. The friendship of earlier years continued after accused became police judge, something as to which, of course, no one can justly complain, but it was accompanied by an intimacy which, in view of the nature of the business of McDonough and its association with the matters with which the accused was called upon as a judicial officer to deal, was almost bound to create suspicion of improper influence. Indeed, the intimacy was of such a character that, according to the evidence of both McDonough and accused, McDonough had occasionally presumed to speak to accused about some "misdemeanor" case pending before him, never a "felony" case, they said, but occasionally some small misdemeanor case, involving some friend, such, for instance, as an alleged violation of the law regulating traffic on public highways. In so far as the matter of gross impropriety is concerned, we must confess we can see no distinction between such conversations with relation to misdemeanor cases and conversations with relation to felony cases, and we doubt if the line between the two classes would be sacredly observed by a judge and another person whose relations were such that they discussed any matter at all pending before the judge. The confessed showing in

regard to this is such that we may feel that in the Catterini matter, or, indeed, in any other matter coming before the accused that might be under inquiry, McDonough *may* have spoken to the accused with a view to influencing his action. There is nothing in the record, however, upon which to found such an inference with reference specifically to the Catterini matter except the possible interest of McDonough therein in view of the testimony of Riccardi and the testimony concerning the note given to Mrs. Riccardi *and McDonough.* In any event, with nothing tangible in the conduct of accused with relation to the case to indicate the presence or effect of improper influence, we are not warranted in inferring anything in the nature of an agreement on his part to accept a bribe or the acceptance by him of a bribe in that matter, or even that he was in any way improperly influenced therein. In so far as he is concerned, the only evidence to connect him with any misconduct in that matter is the absolutely uncorroborated evidence of Riccardi as to an admission by him that he received $150. That uncorroborated evidence absolutely fails to produce even the slightest measure of conviction in our minds. The specific charge against accused with relation to the Catterini matter must be held to be not proved.

[3] None of the specific charges against accused having been sustained by evidence sufficient to satisfy us of its truth, it follows that the order to show cause must be discharged and the proceeding dismissed, and it is so ordered.

Shaw, J., Lennon, J., and Wilbur, J., concurred.

OLNEY, J., Concurring.—I concur in the judgment and the majority opinion, but in order to prevent so far as possible any misunderstanding, I would epitomize what, as I understand it, is the final attitude toward the cause of the majority of the court and what is certainly my own attitude.

The question involved is, of course, purely one of fact, and is to be determined by each of us in accordance with the final impression made upon his mind by the evidence. The impression made upon my mind is one of very strong suspicion that the defendant was guilty in the Catterini case, at least, of the act of corruption with which he was charged. But mere suspicion, even a strong one, is not enough to warrant a positive finding of guilt, and I find that, in spite of the

strength of the circumstance to which Justice Lawlor adverts, the dismissal by the defendant of the charge against Catterini in the face of the direct evidence against him presented to the defendant, I have not that certainty of conviction which would justify me in affirmatively finding the defendant guilty of corruption. Though this is my final conclusion, I feel free to voice my suspicion of the defendant in view of the wholly inexcusable manner in which he performed his judicial duties in general and conducted himself in particular in his relations with McDonough, who from the very nature of his business must have constantly appeared before the defendant, directly and indirectly, as an applicant in matters of bail, where it was so easy for the defendant to dispense, not impartial justice, but judicial favors with or without a monetary consideration.

SLOANE, J., Dissenting.—I dissent. If satisfactory proof of the specific offense of accepting a bribe is necessary to the disbarment of the accused under the charges in this proceeding I would be compelled to concur in the majority opinion. The only direct evidence of such bribe-taking rests on the testimony of Riccardi and his unsupported word can carry little or no weight, and, as to the actual passing of any money between the parties here, there is no corroborating evidence.

But the gist of this accusation for disbarment is not the crime of bribery, but the commission of an act of moral turpitude in the manner of disposition of certain criminal cases pending in the court over which the accused presided, and if the acts complained of are shown to have been influenced by some other corrupt motive than that of bribery, the variance in the proof in that respect ought not to defeat a judgment.

The substance of the charges here, taking the Catterini case as an example, is that in certain felony matters pending before him as a committing magistrate, the respondent was corruptly and unlawfully influenced by a bribe in his decision and disposition of said cases.

Now, bribery is not the crux of the matter, but rather, the gravamen of the offense is the moral turpitude of disposing of these cases under the influence of some corrupt motive. Bribery is merely an incident of the charge, which is fully

met by the proof, if it is satisfactorily established, of some motive for the wrongful act not in itself unlawful. The accused might, for instance, have been charged with favoring the defendants as a simple act of personal friendship to them or their attorneys or sureties. Friendship is a very commendable trait in itself, but as a motive for disposing of criminal prosecutions by a magistrate it would involve an act of moral turpitude. The motive charged here happens to be bribery, a criminal act in itself, but there is not the controlling element of the accusation.

The purpose of the proceeding here is not to convict the respondent of bribery, or of any other specific criminal act, but of wrongfully administering his official duties in the particular matters charged, under some corrupt influence involving moral turpitude.

I have no question under the evidence that the respondent, under some or all of the charges filed, disposed of the matters before him in conscious disregard of his duties as a magistrate. The array of incriminating circumstances is too strong and convincing to be disposed of on the mere ground of coincidence. They strongly tend to corroborate Riccardi's testimony in support of some sort of a prearranged program, and when thus supported, Riccardi's testimony, although that of a self-confessed criminal, may not be wholly disregarded.

Whether this program for the discharge of the various defendants was influenced by bribery, or politics, or favoritism, or friendship, is entirely immaterial. With any motive other than a purpose to faithfully discharge official duty it involved moral turpitude.

We do not even need to resort here to the analogy of the criminal procedure which incorporates the lesser offense within an information charging the greater. If the defendant were on trial for murder alleged to have been committed for pay, could it be held a fatal variance if the proof showed the act was committed for revenge? At any rate, there can be no room for such technicality in a proceeding of this nature.

It may be conceded at once that the rules of criminal procedure apply here to the extent that the respondent cannot be charged with one offense and be convicted of another, but when we consider that the vital element of the accusation is the corrupt and wrongful disposition of certain cases pend-

ing in his court, and not the particular means by which the official action of the accused was influenced, it becomes apparent that the salutary rule referred to is not violated by accepting the proof as showing some other wrongful influence than that of bribery. The test of materiality of variance in an information or indictment is whether the pleading so fully and correctly informs the defendant of the criminal act with which he is charged, that taking into consideration the proof which is introduced against him, he is not misled in making his defense. (*People* v. *Freeman,* 29 Cal. App. 543, [156 Pac. 994]; *Harrison* v. *United States,* 200 Fed. 662, [119 C. C. A. 78].)

The respondent here was fully notified by the accusation of the entire subject matter of investigation involving his relations with Riccardi and McDonough in connection with these criminal prosecutions.

It may be urged that if the evidence does not establish bribery it does not disclose specific wrongful inducement. I do not think that such is the fact. The circumstances are convincing to my mind that there was some prearranged and agreed plan to dispose of these cases in a certain manner, which agreement was acted upon by the respondent. Such a state of facts establishes moral turpitude without giving the moving cause a specific name.

There is nothing in the code provisions or the decisions in this state relating to disbarment to invest this proceeding with such a degree of technicality that should prevent a judgment against respondent if the evidence is such as to clearly prove that the acts complained of were influenced by any corrupt and dishonest motive, whether amounting to bribery or not.

I think the majority opinion tends too much to minimize the effect of the evidence against the accused. Under each of the three separate counts of the accusation the action taken by the respondent was such as to shock the sense of judicial integrity. His own explanation of his conduct is far from satisfactory and in the Pastiango case almost incriminating, and the fact that the program was substantially carried out in the manner that Riccardi had announced tends strongly to corroborate the testimony of the latter that it was all in accordance with a prearranged agreement, whether influenced by a bribe or some other ulterior inducement.

LAWLOR, J., Dissenting.—I dissent. I am convinced from the evidence, tested by the rules of law declared in the main opinion, that the direct testimony of Riccardi as to the three acts of bribery are sufficiently supported by the other evidence to warrant the disbarment of the accused.

Speaking from the impressions I received from the record, I cannot, upon any theory consistent with his innocence, account for the refusal of the accused to hold Catterini for trial upon the evidence presented. In connection with all the other circumstances, considering the grave condition of Mrs. Nanni, and the evidence that bail was to have been denied in the beginning, the fixing of the bail at five hundred dollars cash on each of the two charges is not without significance. The gist of the crime of assault with intent to commit murder is the specific intent to take life, since the only element of murder which is lacking is the failure to execute the deadly intention. The perpetrator of such an offense is as much possessed of a malignant and abandoned heart as if he had not shown bad marksmanship, and keeping in view the hour of the assault, that the woman and child were left to die, and the other surrounding circumstances, it does not appear that those essentials of murder were lacking in this instance.

Two questions are presented on a preliminary examination—has a crime been committed, and is there sufficient cause to believe the defendant guilty thereof. (Pen. Code, sec. 872.) "Sufficient cause" has been held to have the same meaning as "probable cause" as used in section 1487 of the Penal Code. (*Ex parte Heacock*, 8 Cal. App. 420, [97 Pac. 77].) It was declared in *Yaner* v. *People*, 34 Mich. 286, 289: "The examining magistrate is not to be required to nicely weigh evidence as a petit jury would, nor to discharge the prisoner where there is a conflict of evidence, or in case of a mere reasonable doubt of his guilt." Upon the facts in this case the *corpus delicti* proved itself, so that the only question to be determined from the evidence was whether there was sufficient cause for believing Catterini was the assailant. In determining this question, the committing magistrate is not to finally determine the weight of the evidence, nor to resolve conflicts therein, but only to decide whether there is sufficient cause to hold the defendant for trial. In judging the state of mind of the accused in this matter it is incon-

ceivable to me that he, an experienced practitioner and judge of the police court successively for nearly twenty years, did not know and understand it was his plain duty to hold the defendant so that a jury, under the sanctions of a trial on the merits, where all the evidence is presented, could determine whether he was the guilty party. Of course, a mere mistake of judgment, or gross carelessness, yielding to influence, sympathy, or the like, on the part of the magistrate would not constitute bribery as charged herein, but in the presence of evidence such as was adduced in this case the weightiest consideration should be given to the failure of the accused to hold Catterini so that he could be tried in the superior court.

A brief reference to some of the salient features of the evidence will, I think, demonstrate this. Catterini had lived in the Nanni household, eating at the same table with the family for several months. While the room where the shooting occurred was dark, in the struggle both the woman and the child were given an opportunity to determine the identity of the assailant. Light came through a crack in the window-shade. The woman tore from the throat of the assailant a necktie which was identified as belonging to Catterini. One of his shoes was afterward found in the room. Catterini's defense, in addition to proof of good character, was an alibi. The crimes were committed in a house in the Mission district; the alibi witness was the keeper of a dance-hall on the Barbary coast, where Catterini testified he was at the hour of the shooting and during the rest of the night. When first interrogated he said he was in a room a block away when the bells announced the new year. He admitted that a revolver with three empty barrels and showing recent bloodstains, which was found in his trunk by an officer, belonged to him. He first admitted he was out in the Mission about 7:30 or 8 o'clock, but denied he was at the Nanni house on that day or night. Detective Officer Thomas Fuhrman testified Catterini told him he was in the Nanni home for a few minutes about 8 o'clock. Mrs. Nanni testified that about a month before the shooting Catterini had threatened to take her life, and, while admitting the incident, his version of what took place is that she requested him to kill her. When questioned about the tie and pin, Catterini said they were in his trunk, whereupon he was shown these articles by the officer. Then

he said he did not know how the officer got the pin, but stated he left the tie at the Nanni household some time before.

The principal reason assigned by the accused for discharging Catterini was that he voluntarily surrendered. The surrender took place some seventeen hours after the shooting and about the same length of time before the services of the facile Riccardi were engaged, and the work of blocking justice began. Catterini's action in surrendering may have comported either with his guilt or his innocence, for if he were guilty, going into hiding or seeking flight would be strong evidence against him, and the question ought to have been left to the jury to decide. The accused also remarked when he discharged Catterini: "It seems that a person who was present committing an act of that character would have rendered some other mark of identification which could have been made more satisfactory!" Is not the reason given by the accused for going out of his province as a committing magistrate and passing upon the merits of this case strongly indicative of an intention to exonerate the defendant for some reason other than a lack of evidence?

Riccardi testified that the reason the preliminary examination was opened at the hospital was because of two conversations he had with McDonough, the latter saying in the first he would speak to the accused about the case, and in the second that he had done so, the point being that as the case would be heard in the "Woman's Court," which the accused would preside over during the current month (each judge, it seems, holds the court for a month alternately), he would "lose jurisdiction of that case and once he loses jurisdiction we are in a nice hole." As to the eight hundred dollar promissory note: McDonough admits that he received eighty dollars commission out of a transaction he testifies was a mere accommodation to Riccardi, in addition to the one hundred dollars commission he obtained from the bail money. To my mind the entire story of McDouough as to how he came to indorse the note is palpably improbable and not entitled to credence. Assuming this testimony to be fabricated, it must be taken as inferential proof that the entire bail transaction was tainted with corruption. Why resort to an invention if the note transaction was as McDonough testified? Why was there need for McDonough furnishing security to

the bank?  Mrs. Riccardi had about four thousand dollars on deposit there.  According to McDonough, he had known Riccardi the three or four months the latter had been practicing in the San Francisco police courts.  The accused also knew Riccardi.  Riccardi tells of meeting the accused in saloons, including McDonough's, and in his court chambers and talking over cases with him.  It may be inferred that Riccardi's identity with the "system" about which he has testified was becoming known, and, of course, even an honest judge on that bench would not fail to appreciate that the due administration of justice was imperiled by the nefarious methods of so gifted a crook as Riccardi.  It may also be inferred that Catterini was not in ignorance of the system.  The evidence impresses me that Catterini was neither frank nor unsophisticated.  He had property, and he evidently knew what to do and where to go in order to get results.  Riccardi and McDonough were soon seen in action, the judicial machinery appeared to function harmoniously, and everything moved rapidly except the decision itself.  Must we shut our minds to the plain import of the evidence simply because one of the guilty participants has chosen for reasons of his own to reveal the shameful conditions shown to hedge the administration of justice in the police courts?

Riccardi has been attacked as a witness in all the modes known to the law.  His testimony gives me the impression that he has no scruples which would induce him to tell the truth in a matter of importance to himself if it seemed to his detriment to do so.  He probably hoped, because of his willingness to expose the system, that some concession might be made to him by the public authorities.  But notwithstanding that witnesses such as Riccardi are to be distrusted, it is nevertheless the solemn duty of courts of justice in weighing their evidence, and especially where matters affecting the public good are at stake, to endeavor to extract from their testimony as much of the truth as is possible—to sift the false from the true, for we learn as judicial officers that justice is often served from the lips of guilty participants in great public wrongs.

Now, I do not accept the reasoning of the majority opinion as to how Riccardi expected to be benefited by the testimony he gave.  He is presented in this proceeding by a committee of the Bar Association of San Francisco, composed of

earnest and sincere members of the bar faithfully endeavoring to vindicate the ethics of the profession and purge it of disreputable members, and the bench of venal judges. But it is plain to me that Riccardi realized he could only help himself by satisfying the committee that he had told the truth. According to the evidence, the committee refused to make any promises of help to Riccardi, and certainly since the Bar Association had taken up the work of cleansing the police courts, the committee would neither advocate nor tolerate any leniency being shown him if it believed he had given false testimony against a judicial officer. Moreover, the effect of sensational disclosures on the public mind is so diffused, I do not think as shrewd a man as Riccardi would expect any tangible results from that source. In my opinion, Riccardi testified under circumstances peculiarly calculated to induce him to tell the truth. He was in the toils of the law with a long term of imprisonment ahead of him. There is no evidence of personal hostility on his part toward the accused. And considering all that there is at stake to the accused and to McDonough in this proceeding, I think there is strong reason for closely scrutinizing their testimony, and especially that of the former, whose denials of the acts of bribery are couched in stereotyped and colorless phrase. I do not understand that my learned associates who have signed the majority opinion entertain any doubt that the conditions Riccardi described as the "system" did not in fact exist. But apparently because he, an admitted actor in the system, comes before us to tell the miserable story, his testimony must be practically discarded when it comes to the question whether the accused was a factor in the system. If Riccardi's story of the system is true, it follows, of course, that judges in the police courts have been debauched. I apprehend that once it is believed the accused was a part of the system there could be no hesitation in finding sufficient support for Riccardi's testimony that he acted corruptly in this particular case.

In cases of criminal confederation evidence of close relationship between the members of the enterprise is always regarded as of a most persuasive character. That an intimate relationship existed between McDonough and the accused, and that they discussed cases which came before the latter, is admitted by them. I shall not pause to dwell on

what is urged upon us in extenuation of their indiscretions. For fifteen years McDonough was a professional bail-bond broker, conducting the business in his saloon, which was in the neighborhood of the criminal courts. In my view, this constituted a menace to the administration of justice. It must be so regarded by every right-thinking person, whether a judicial officer or a private citizen. As a bail-bond broker McDonough did a very large business and was daily brought into contact with judges and other officials who had to act on the bail he furnished. Such contact is very apt to breed contamination, and for that reason, in my judgment, professional bondsmen should not be accepted by courts of justice. McDonough kept track of the volume of his bail brokerage business for income tax purposes, but otherwise preserved no record of bail transactions. In this proceeding he was not able to fortify his testimony by books of account of any sort. It is not difficult to understand why he kept no records. When bail has been declared forfeited the sureties may seek to have the order of forfeiture discharged (Pen. Code, secs. 1305–1307). Is it not inherently probable that in such matters McDonough would use every means within his power to avoid the loss of his money? His bail-bond business is as much on trial in this proceeding as is Riccardi's credibility or the integrity of the accused. In view of all the surrounding circumstances it is against every rule of probability that the relationship between the accused and McDonough was of the character they have both described. It must shock the sense of propriety of everyone that a relationship could exist between a judge and a bail-bond broker under the circumstances shown, for it would tend to scandalize the administration of justice, create suspicion, forfeit public confidence and respect, invite corruption, and be directly responsible for the very conditions described in the evidence in this proceeding.

I am of the opinion that there is sufficient evidence which is not "purely guesswork" to support the testimony of Riccardi that the accused was bribed in this case through the medium of McDonough, and that the conversation between Riccardi and the accused as to the amount of the bribe did take place. This, in itself, would constitute an admission of guilt. I have not attempted to reconcile with the evidence in the Catterini case the action of the prosecuting officer as

to the sufficiency of the evidence to hold Catterini for trial, and I shall therefore leave him to his own explanations.

Under the evidence in the Pastiango case every reason is shown for and no reason against holding the defendant for trial. The accused testified he believed the defendant was guilty of the act, but that it was not done with an "impure motive." But, notwithstanding this, after the felony charge was dismissed, the defendant was prosecuted and convicted under Ordinance 1059 upon the identical evidence offered under the felony charge. This ordinance prescribes an offense where any lewd, indecent, or obscene act is committed. The meaning of section 288 (the felony statute) is "lewd and lascivious" conduct, when accompanied by a certain specific intent. But even if we assume the accused dismissed the felony charge for the reasons given, upon what theory can his action in suspending the sentence of three months on the misdemeanor charge, thereby permitting the defendant to go unwhipped of justice for tampering with a girl under fourteen years of age, be explained or defended? I think this case also furnishes corroborating evidence.

Even assuming in the Spinelli matter that the accused did not fix the bail, do not the surrounding circumstances tend to corroborate the testimony of Riccardi? No satisfactory explanation is given by the accused for taking up the question of bail in this case. This fact, however, standing by itself might not be significant. But it does not seem likely that Riccardi would go to the home of the accused *with the sureties* in the absence of some understanding or arrangement. Besides, the accused admitted that he "depended on Riccardi" as to the sufficiency of the undertaking. This admission certainly shows something more serious than "a gross neglect of duty." The transaction occurred in November, 1918, and by this time, of course, the accused knew of Riccardi's character and activities. It was stated Riccardi's gross yearly earnings from his practice in the Hall of Justice were between forty thousand dollars and sixty thousand dollars, out of which he claimed he only netted twelve thousand dollars. Moreover, if Riccardi's story was an invention it is not likely he would have placed the amount of the bribe at the insignificant sum of fifty dollars. In my opinion, the evidence in this matter is corroborative of Riccardi's testi-

mony and explains why the accused "depended" upon him in the acceptance of the undertaking.

I have given my appraisal of the evidence. I am unable to believe that in the Catterini and Pastiango cases the accused, an experienced judge, did not reach the conclusion there was sufficient cause to hold the defendants for trial. Human life has been forfeited and the liberty of the individual taken under the forms of law upon less convincing evidence than that presented in these cases—upon a *preliminary examination*. But a failure by the accused to find there was sufficient cause would not, of course, call for disbarment if his action upon any hypothesis of innocence could be attributed to a mistaken conception of the law or the evidence, or an erroneous or otherwise unwarranted exercise of discretion. In none of these transactions is it claimed or suggested the accused was moved by personal appeal, sympathy, or compassion, for if he was so influenced his conduct would not be corrupt within the meaning of the accusation, however inexcusable it may have been. But in my study of the evidence I could not accept the conclusion announced in the prevailing opinion, for I reached a point where neither the self-confessed criminality of Riccardi, nor the presumptions of innocence and that his official duty was regularly performed with which the accused stood clothed, could avail against the plain import and inherent probabilities of the evidence indicative of guilt.

I am of the opinion that the accused should be disbarred.